Filed 4/8/26  P. v. Joseph CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL JOSEPH,<br><br>    Defendant and Appellant. | B338771<br><br>(Los Angeles County<br>Super. Ct. No. MA085387) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert G. Chu, Judge.  Remanded with direction.

Benjamin A. Owens, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Sophia A. Lecky, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Michael Joseph of various sex offenses. On appeal, he contends that the trial court abused its discretion and violated his constitutional rights by admitting evidence of a sex offense he committed in 1996. We reject that contention and conclude that the trial court properly admitted evidence of that offense. However, we agree with Joseph's other contention, that remand is necessary for the trial court to reconsider whether to strike one of his prior convictions.

## BACKGROUND

I.    Evidence at trial

Joseph was charged with sexual assault offenses against Ariana R. with allegations under the "One Strike" law, Penal Code[1] section 667.61, which sets forth an alternative and harsher sentencing scheme for certain sex crimes perpetrated by force. Ariana, her neighbor, her husband, and a sexual assault response team (SART) nurse testified at trial, and the trial court admitted evidence that Joseph had a conviction for a prior sex offense. Joseph and other witnesses testified in his defense.

A.    *The sexual assault of Ariana*

In June 2023, Ariana was living in an apartment with her husband Ricky and their ten-month-old daughter. Joseph lived two apartments down from them. When Joseph moved into his apartment in November 2022, he introduced himself to Ariana as "Bear." Once, while Ariana was getting her mail, Joseph asked her, "What's the deal?" and when was she going to let him "holler" at her. Interpreting Joseph to be referring to something

---

[1]    All further undesignated statutory references are to the Penal Code.

2

sexual, Ariana told him that she was married, and Joseph responded that he knew that.

On the evening of June 18, 2023, Ariana and her husband saw Joseph walking "a bit funny," "bouncing and kind of putting his hands in the air."  Thinking that Joseph was trying to be funny, Ariana laughed and he looked at her.

The next morning, a Monday, Ariana left for work at about 7:40 a.m.  Joseph was at his front door.  Ariana bade him "Good morning" and said, "Excuse me," and then everything "went black."  The next thing she remembered was fighting and feeling like she had been tackled.  Ariana realized she was in Joseph's apartment, and Joseph was behind her with his arm around her neck, choking her.  He released her, and Ariana bit him.  Joseph turned Ariana onto her stomach, held her arms behind her back, and punched her in the rib area.  Joseph told Ariana to do what he said if she wanted to see her daughter again.

The next thing Ariana remembered was being in the bathroom and Joseph tying her arms behind her back and her legs together.  He tied what looked like an orange garden hose that had "PVC" written on it around Ariana's ankles and neck, and down to her stomach.

Joseph asked Ariana, "You felt that disrespected?" and said that she had laughed at him.  When Ariana asked if she could see her daughter one last time, Joseph told her he did not give a " 'fuck' " and that he was a sadist, asking if she knew what that meant.  He then told her it meant he got "off on fear."  Joseph put a sock into Ariana's mouth and duct taped her mouth.  He told Ariana that he should kill her husband and baby so that nobody would know what he had done.

Joseph left the bathroom but returned with Ariana's purse. He asked if she had cash, and she gave a muffled "No." He then smashed her phone against the counter and demanded her bank card pin number, which she gave to him. Joseph came and went several times and also left for about 10 minutes.

At some point, Joseph returned and "hump[ed]" Ariana from behind. Joseph then asked Ariana if she had ever been tortured, put a pillowcase over her head and tied it, and then threw her into the bathtub. Joseph turned on the water, which he left running for five to ten minutes. He then took Ariana out of the bathtub, removed the pillowcase, and asked if she knew what was going to happen. She answered that he was going to have sex with her. Joseph pointed a gun at her temple and told her that he would kill her if she screamed.

Joseph penetrated her anus with his penis, and Ariana passed out. When she came to, Joseph asked if she remembered his rules. Ariana repeated that he would kill her if she screamed or moved or did something he did not like. At some point, Joseph put the gun in her mouth. Joseph cut off her restraints and told her to undress. Telling Ariana that she would be "my porn star for tonight," he told Ariana to suck his penis. Ariana did as he demanded. He then bent her over the sink and penetrated her vagina with his penis. After about ten minutes, he told her to get onto the floor, and then he again penetrated her vagina with his penis. Ariana told him he was "so good," in an attempt to get him to free her.

Ariana then engaged Joseph in conversation, and they talked about parenting because Ariana could hear a child in the background. Joseph also told her he had been arrested in the past. After talking for about 20 minutes, Joseph said he could

4

not believe what he had done to Ariana. Ariana assured him she was fine and that they would "get past this." Joseph began to cry, and he handed her a knife with jagged edges, saying, "Here. If it makes you feel any better." She said no and put the knife down. Ariana told Joseph she would not say anything and asked if she could go home. Joseph gave Ariana an Arizona tea jug that he had filled with water for her to drink from. He told her she could leave but asked her to shower first. Ariana asked him for a hairbrush, he gave her a gray one, and she brushed her hair with it. She then got in the shower and washed her hair and body with small amounts of shampoo and body wash, not wanting to scrub away any evidence. Ariana got dressed and exited the bathroom. Joseph was holding a little boy. Ariana retrieved her purse from the bathroom and left the apartment.

After realizing her husband was not home, Ariana went to her neighbor Darrian Walton's apartment. When Walton opened the door, Ariana ran inside and told Walton to call her husband. Walton testified that Ariana had circular burn-like marks on her wrists. When Ricky arrived, he took Ariana to the hospital, where a SART nurse examined her. Ariana noticed that it was 11:45 a.m. when they were en route to the hospital.

Ricky testified that he left their apartment at about 9:00 a.m. When he saw Ariana's car still in the parking lot, he became concerned and called and texted her multiple times, but she never responded. He called Ariana's mother and sister, but they too had not heard from her. Ricky was driving to the hospital where Ariana worked when Walton called him and said Ariana was at his apartment. When Ricky arrived at Walton's apartment, Ariana said she did not know what had happened to her. As she and Ricky walked by Joseph's apartment on their

way to the hospital, Ariana said, "Shush." Ricky asked if "it was him," referring to Joseph.

When Joseph was arrested the day after Ariana was assaulted, he had a loaded pellet gun that had been modified to fire .357 rounds. He was also wearing a black and blue glove, and he had an abrasion to his left palm area.

After his arrest, Joseph told the investigating officer, Detective Justin Waites, that Ariana had been cheating on her husband with him since November 2022. He and Ariana had been having sex twice a week. But the week before the incident, Joseph told Ariana he was seeing someone else, which upset her.

B.    *The investigation*

The SART nurse who examined Ariana testified that when she first encountered Ariana, Ariana was crying, her hair and clothing were wet, and she said, "All I saw was dark." The nurse immediately observed petechiae on Ariana's face, neck, the palate of her mouth, and ears consistent with strangulation; bruising on her mouth and face; and linear marks or redness on her neck. Ariana had pattern injuries from her head down to her legs that were consistent with being tied up, and her fingernails were broken and one fingernail had been ripped from the nailbed. Ariana also had redness in her cervical area, multiple lacerations to her anal verge (the area going into the anal canal and rectum), and extensive lacerations going into her anal area. Injuries to Ariana's genitals and anal area were consistent with the sexual assault Ariana reported.

The investigating detective testified that he spoke to Ariana at the hospital. She told him that her assailant wore a blue cloth glove and had a gun and a hunting-type knife with a jagged edge. Law enforcement found various items that Ariana

6

had described in Joseph's apartment: orange-yellow rope, duct tape, a gray hairbrush,[2] a knife with a jagged edge, an empty Arizona tea jug, and a shampoo bottle. When the detective entered the bathroom, the smell of bleach overwhelmed him, and the bathtub was full of what the detective thought were cleaning chemicals.

DNA likely to have originated from Joseph was found on Ariana's body.

### C. *Propensity evidence*

Nicole D. testified that on April 27, 1996, she was living in an apartment in Utah with her husband and three children, aged three, two, and four weeks. Nicole asked a downstairs neighbor to help her with a broken cable box. Her neighbor came over with two men, including Joseph, whom she did not know. Nicole thought that Joseph had been drinking. The men were unsure how to fix the cable box, so the neighbor and one of the men left to go to the gas station, leaving Joseph behind. Nicole told Joseph that she needed to attend to her children and she went to her bedroom, thinking he would leave. However, when she came out of her bedroom, Joseph was in the hall. He pointed a gun at her head and told her to be quiet and they were going to "do this." Joseph pushed her onto her bed and tried to undo her pants. Two of the children came in and started screaming. Joseph waved the gun at Nicole's daughters to shut them up. Nicole begged Joseph not to do this in front of her kids, that she had just had an episiotomy, and that he could rip her open causing her to bleed to death.

---

[2]     The hairbrush had no hair in it.

Nicole then heard a knock on her door, and her neighbor Amanda entered the apartment. Joseph told Nicole to act like nothing had happened. He put the gun in his pocket and followed Nicole to the front room, where Amanda was waiting. Amanda asked to use Nicole's phone, and Nicole whispered to Amanda not to leave. Soon after, Nicole's neighbor and the other man returned from the gas station and told Joseph that he needed to go. When Joseph said he did not want to go, the men "got a little ruder" until Joseph left. Amanda then called 911.

D. *Defense evidence*

Davion Davis testified that he lived in the same apartment complex as Joseph, who was like a brother to him. On the day of the incident with Ariana, Davis was at Joseph's apartment from 7:14 a.m. to about 8:30 a.m. Davis left but returned at 10:00 a.m. and stayed for about another hour. The only people in the apartment were Davis, Joseph, and the child.

Another neighbor of Joseph's who lived on the same floor testified that on the day of the incident she saw Joseph between 7:10 a.m. and 7:30 a.m. Joseph was carrying a "beverage fridge" to a car. The neighbor left to take her children to school. Based on the neighbor's routine, if it was a Monday, she would have returned to her apartment between 11:45 a.m. and 12:15 p.m., and she saw Joseph repairing a dresser outside his apartment.

A defense investigator testified that Walton's mother told her that three weeks before the incident, Walton saw Ariana smile at Joseph in a flirty way. However, both Walton and his mother denied that Walton said this about Ariana.

Joseph testified that he was convicted of sexual abuse in Utah in 1996 and sentenced to 15 years in prison. After serving his sentence, he moved to California, where he was convicted of

8

two robberies in 2016 and again sentenced to prison. In November 2022, Joseph moved to the apartment building where Ariana lived. He met Ariana the day he moved in and they talked frequently, but they stopped talking when Joseph's wife moved in with him in December 2022.

Joseph and Ariana became "intimate" in February 2023, and she went to his apartment every day. They had sex four times during their affair. The body wash and hairbrush in his apartment belonged to Ariana. Ariana told Joseph that she and her husband were having problems, and they talked about her medical issues, his prior conviction in Utah, and that he had received a letter informing him that he had satisfied "requirements under Utah law for that particular charge" and was "being removed from any type of documentation."

On June 17, 2023, which was two days before the incident, Joseph and Ariana had sex. But Ariana got upset when Joseph told her he was reconciling with his wife, who had moved out that April.

On June 19, 2023, Davis stopped by in the morning to help Joseph childproof the apartment. Joseph took a refrigerator to the car at about 7:30 a.m., and he worked on setting up his surround sound in the living room until about 9:30 a.m. A carpenter by trade, Joseph kept tools in his apartment, including an orange compression hose and rope. He frequently wore gloves when working.

Joseph denied forcing Ariana into his apartment, having sex with her, sodomizing her, or assaulting her.

## II. Verdict and sentence

A jury convicted Joseph of sodomy by use of force (§ 286, subd. (c)(2)(A); count 1), forcible oral copulation (§ 287, subd. (c)(2)(A); count 2), forcible rape (§ 261, subd. (a)(2); count 3), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 4). As to counts 1, 2, and 3, the jury found true special allegations that he kidnapped the victim, personally used a firearm, and tied or bound the victim (§§ 667.61, subd. (e), 207, 209, 209.5, 12022, 12022.5, 12022.53).

On June 14, 2024, the trial court found that Joseph had two prior strike convictions in the same case. Defense counsel argued that one strike had to be dismissed under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*) because Joseph engaged in a single act that resulted in the two strikes. The facts, based on the probation report as relayed by defense counsel, were that Joseph was driving a vehicle in which two accomplices were passengers. His accomplices took a phone from Victim No. 1. When Victim No. 2 tried to get the phone back, force was used to keep the phone. The prosecutor countered that the two victims were in a car, a codefendant took the phone from a victim and ran, the second victim ran after him and retrieved the phone, and then three men attacked the second victim and took the phone. It was unclear whether Joseph was one of the three men who attacked the second victim. But it was not a single act but separate acts, and Joseph aided and abetted those acts.

The trial court agreed with the prosector's argument, denied the motion to dismiss a prior strike, and sentenced Joseph under the "Three Strikes" law to 25 years to life on counts 1, 2, and 3, each, tripled to 75 years to life, and to eight months

10

doubled to 16 months on count 4, for a total prison term of 225 years to life plus 16 months.

## DISCUSSION

I.    Admissibility of Joseph's prior conviction for forcible sexual abuse

Joseph contends that the trial court abused its discretion and rendered his trial fundamentally unfair by admitting evidence of his conviction for forcible sexual abuse against Nicole.

### A.    *Additional background*

Before trial, the prosecutor said he would seek to admit evidence of Joseph's prior 1996 conviction in Utah for forcible sexual abuse. Defense counsel objected that the conviction had low probative value because Joseph committed the offense when he was 15 years old (he was 43 years old when he assaulted Ariana), the prior offense was a "nighttime opportunistic incident with a stranger" whereas the current incident was a planned morning attack, and the prior offense did not involve penetration. Also, the prior offense was remote in time, inflammatory, and it was not possible to investigate it given the passage of time, as one witness had died and another did not remember the events.

The trial court found that the prior offense was admissible under Evidence Code sections 1101 and 1108 because the past and current offenses involved similar facts such as use of a firearm and "a willingness to carry out the act with minor children present."

At trial, Nicole testified about the sexual assault as described above. The trial court also admitted documents regarding Joseph's prior conviction: the charging document, the

11

minute entry of the preliminary hearing, and the minute entry of the judgment.

B. *The trial court did not abuse its discretion by admitting propensity evidence or violate Joseph's constitutional rights*

Evidence of prior criminal acts is generally inadmissible to prove the defendant's conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) But where a defendant is charged with a sexual offense, evidence the defendant committed other sexual offenses is admissible to prove the defendant's propensity to commit crimes of a sexual nature if the evidence is not inadmissible under Evidence Code section 352. (Evid. Code, § 1108, subd. (a); see generally *People v. Falsetta* (1999) 21 Cal.4th 903, 911; *People v. Christensen* (2014) 229 Cal.App.4th 781, 795–796.) Accordingly, evidence a defendant committed other sexual offenses should be excluded under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Otherwise, admissibility of uncharged acts depends on (1) whether the propensity evidence is similar enough to the charged behavior so that it tends to show the defendant committed the charged offense, (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts, (3) whether the uncharged conduct is remote or stale, (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, and (5) whether admitting the propensity evidence will require an

12

undue consumption of time.  (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.)

We review a challenge to a trial court's admission of Evidence Code section 1108 evidence for abuse of discretion. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 824.)

As we now explain, the trial court did not abuse its discretion by admitting evidence of the uncharged offense.

### 1.    Similarity of the offenses

The uncharged offense involving Nicole was similar to the current offense involving Ariana.  In both cases, Joseph used a gun and did more than just display it:  he pointed a gun at Nicole's head and waved it threateningly at her children, and he put a gun in Ariana's mouth.  In both cases, Joseph's victims were mothers, and the crimes took place with children present. Nicole's three children were in the apartment, and two of them came into the room where Joseph was abusing Nicole.  Similarly, Joseph's son was in the apartment while he was assaulting Ariana, who could hear the child at times.  And in both cases, Joseph threatened children:  he waved a gun at Nicole's children when they came into the room, and he told Ariana he would kill her baby, as well as her husband.

Joseph counters that the offenses were dissimilar because Nicole was a stranger, but he knew Ariana.  Although Ariana and Joseph had some minimal interaction as neighbors, those bare contacts in no way elevated Ariana to something more than a stranger to Joseph.  Indeed, in both incidents, Joseph took advantage of unplanned situations in which both victims found themselves alone:  Joseph was in Nicole's apartment to help fix a cable box and Ariana happened to pass Joseph as she was on her way to work.

This case is therefore not like *People v. Harris* (1998) 60 Cal.App.4th 727, which Joseph cites. In that case, the prosecution charged defendant, a nurse, with sex offenses against two patients. (*Id.* at pp. 731–732.) One victim had consensual sex with defendant once and he raped her a second time. The second victim was on heavy medications when the defendant sexually assaulted her. (*Ibid.*) The trial court admitted a highly sanitized version of a violent sexual assault that the defendant had committed 23 years earlier. Although the actual facts were that the defendant had entered the victim's apartment, used a sharp instrument to rip her muscles from her vagina to rectum, and stabbed her in the chest with an ice pick, the jury only heard that the bloodied victim was found in her nightgown with injuries to the head and face. (*Id.* at pp. 734–735.) On appeal, the court found that the prior offense should have been excluded because the charged crimes involved breach of trust whereas the prior crime involved a violent and perverse attack on a stranger, the incomplete version of the prior offense might have caused jurors to speculate about the true nature of the earlier crime, the prior offense was remote, and the evidence had little probative value because the incidents were so dissimilar. (*Id.* at pp. 738–741.)

*Harris* is distinguishable because, as we have detailed, Joseph's prior and charged sex offenses were similar. (See *People v. Callahan* (1999) 74 Cal.App.4th 356, 367–368 [Evid. Code, § 1108 does not require precise or exacting equivalence as long as prior offense is " 'rationally probative' "].) Moreover, *Harris* was also concerned about the sanitized version of the prior offense given to the jury which allowed them to speculate about it. That was not an issue here.

## 2. Strength and inflammatory nature of prior offense

The propensity evidence was not stronger and more inflammatory than evidence of the charged acts. Joseph did not punch or tie up Nicole for an extended time as he did to Ariana. Also, he did not penetrate Nicole, albeit likely because a neighbor interrupted him. However, Joseph penetrated Ariana anally and vaginally. (See, e.g., *People v. Lewis* (2009) 46 Cal.4th 1255, 1287 [trial court did not abuse its discretion where uncharged offense was "less inflammatory" than charged offenses].) Also, the presence of Nicole's children while he was abusing her did not render that crime more inflammatory. Rather, Joseph also assaulted Ariana while a child—Joseph's son—was present. For these reasons, we do not agree that Joseph's sexual abuse of Nicole was likely to invoke an improper emotional bias or cause jurors to prejudge him based on extraneous factors. (See *id.* at pp. 1287–1288 ["Although evidence of the prior offense would elicit a negative emotional response from the jurors …, it was less inflammatory than the charge that defendant raped, strangled, and cut the throat of" the victim "while her children slept upstairs"].)

## 3. Remoteness

Joseph assaulted Nicole in 1996, about 25 years before he committed his crimes against Ariana in 2023. A defendant's incarceration is relevant to whether criminal conduct is remote because incarceration decreases a defendant's opportunity to commit additional crimes. (See, e.g., *People v. Loy* (2011) 52 Cal.4th 46, 62–63 [defendant's prior crime not remote under Evid. Code, § 1108 where defendant spent years in prison during

15

intervening period]; *People v. Steele* (2002) 27 Cal.4th 1230, 1245 [17-year gap between prior and current murders explained by incarceration during substantial part of gap].)  Joseph was sentenced to and, according to him, served 15 years in prison for his crime against Nicole in 1996.  Based on that timeline, he would have been released in 2010 or 2011.  He then committed robberies in 2016, was sentenced to prison, and paroled in January 2023.  Therefore, although about 25 years separated his sexual abuse of Nicole and his sexual assaults against Ariana, he was incarcerated for at least 20 years of that time.  (See *People v. Cordova* (2015) 62 Cal.4th 104, 133 [crimes occurring 13 and 18 years before charged crime were admissible]; *People v. Spector* (2011) 194 Cal.App.4th 1335, 1389 [28-year-old prior offense admissible].)  He therefore lacked opportunity to commit other sexual-related crimes, and this lack of opportunity mitigates any remoteness of the prior offense.

### 4.    Evidence Code section 352

Propensity evidence regarding Nicole was unlikely to confuse or distract jurors from their main inquiry.  Rather, Nicole was the sole witness to testify about the uncharged evidence, and her testimony did not consume an undue amount of time.  Joseph, however, argues that the trial court abused its discretion under Evidence Code section 352 by allowing Nicole to testify at all, because his prior conviction resulted from a plea and counsel was unable to locate witnesses due to the passage of time.  However, our Legislature enacted Evidence Code section 1108 to "relax the evidentiary restraints" imposed by Evidence Code section 1101, to "expand the admissibility of disposition or propensity evidence in sex offense cases," and "assure that the trier of fact would be made aware of the defendant's other sex

16

offenses in evaluating the victim's and the defendant's credibility." (*People v. Falsetta, supra*, 21 Cal.4th at p. 911.) Therefore, while the trial court could consider any difficulty the passage of time had on Joseph's ability to counter Nicole's testimony, this was merely one factor for the trial court to consider.

Nor do we agree that the evidence had little probative value based on Joseph's young age when he sexually abused Nicole. He asserts that his "actions at the age of 15 are not particularly probative of his intent and actions as an over the age of 40 years adult." Joseph's age when he committed the prior offense could be a factor to consider in conducting an analysis under Evidence Code sections 1108 and 352. However, cases about juvenile criminal culpability focus on why we treat juveniles differently for purposes of sentencing; for example, their still developing brains and social situation make them less culpable than adults. (See generally *Miller v. Alabama* (2012) 567 U.S. 460, 471–474.) Joseph's age when he sexually abused Nicole certainly might help to explain why he committed his crime and speak to what his punishment should have been for it. But his age is less relevant to, for example, his modus operandi or to similarity between the crimes, which are the factors at issue here. Moreover, defense counsel cited Joseph's age when he sexually abused Nicole as a ground to exclude the uncharged conduct. The trial court therefore knew and, we must assume absent evidence to the contrary, considered that fact but nonetheless found Nicole's testimony admissible.

Given the balance of factors, we cannot find that the trial court abused its discretion by admitting the propensity evidence. Thus, even if we agreed that Joseph's sexual assault against

17

Nicole was remote, we would not conclude that the trial court abused its discretion. Rather, Evidence Code sections 352 and 1108 do not contain rigid requirements (*People v. Cordova, supra,* 62 Cal.4th at p. 133), and "significant similarities between the prior and the charged offenses" may balance out any remoteness (*People v. Branch* (2001) 91 Cal.App.4th 274, 285).

### C. Fundamental fairness

Joseph also contends that the admission of propensity evidence undermined the fundamental fairness of his trial and violated his constitutional rights. However, admission of propensity evidence under Evidence Code section 1108 does not violate a defendant's constitutional rights. (*People v. Falsetta, supra,* 21 Cal.4th at p. 907.) We therefore reject this contention.

## II. Sentencing

Joseph next contends that the trial court erred in sentencing him as a third strike offender because his two prior strike convictions for robbery were based on a single act.

In a series of cases, our California Supreme Court has addressed how many strikes should be counted when a defendant has multiple convictions arising from related acts. In *People v. Fuhrman* (1997) 16 Cal.4th 930 (*Fuhrman*), the defendant had multiple strike convictions stemming from an incident in which he stole a car, collided with another car and brandished a gun at that car's driver, and then forced his way at gunpoint into a truck and made the truck driver take him from the scene. Although the court held that qualifying strike convictions can be brought and tried in the same case and counted as separate strikes, the court left open whether the Three Strikes law allows "separate strikes to be imposed for offenses that in a prior proceeding were

18

determined to have been committed as part of an indivisible transaction, and as to which it was concluded that imposition of separate punishment for each offense would constitute multiple punishment proscribed by" section 654.  (*Fuhrman*, at p. 941.)

The court addressed that issue in *People v. Benson* (1998) 18 Cal.4th 24.  In that case, the defendant entered an apartment and stabbed its occupant, resulting in strike convictions for residential burglary and assault with intent to commit murder.  (*Id.* at p. 27.)  The court held that crimes sustained in one action and arising from the same facts are separate strikes, even if the crimes were closely connected and punishment on one had been stayed under section 654.  (*Benson*, at p. 26.)

Next, *People v. Vargas* (2014) 59 Cal.4th 635, 637 (*Vargas*), on which Joseph relies, held that two prior convictions arising out of a single act against a single victim cannot constitute two strikes under the Three Strikes law.  The single act in *Vargas* was forcibly taking the victim's car, which resulted in convictions for robbery and carjacking.  (*Id.* at p. 645.)

Finally, while this matter has been pending on appeal, our California Supreme Court issued *People v. Shaw* (2025) 18 Cal.5th 1089 (*Shaw*), which involved two victims.  In that case, the defendant had two prior convictions for gross vehicular manslaughter arising from an incident in which Shaw struck a car, killing two passengers.  (*Id.* at p. 1093.)  The court found that its rationale in *Vargas* applied, notwithstanding that multiple victims were involved.  That is, voters in enacting the Three Strikes law would have reasonably " 'understood the "Three Strikes" baseball metaphor to mean that a person would have three chances—three swings at the bat, if you will—before the harshest penalty could be imposed.  The public also would have

19

understood that no one can be called for two strikes on just one swing.' " (*Shaw*, at p. 1098.) The dispositive point thus is whether the convictions stem from a single act, and not how many people are harmed by that singular act. (*Id.* at pp. 1101–1102.) The court said, "It is true that an act that harms multiple people is more serious than an act that does not and may be punished accordingly. But the purpose of Three Strikes sentencing is not (and, for double jeopardy reasons, cannot be) to impose additional punishment for prior criminal acts that have already been punished. The purpose is instead to fix the appropriate punishment for the defendant's *current* offense—an offense the law considers ' " 'to be an aggravated offense because a repetitive one.' " ' " (*Id.* at p. 1101.)

Justice Groban, joined by Justices Liu and Evans, concurred in *Shaw*. Although Justice Groban agreed with *Vargas* and the majority's conclusion in *Shaw*, he suggested that the cases called into question the court's prior determination, among others, that "two offenses committed in quick succession against two separate victims should qualify as separate strikes. (See *People v. Fuhrman*, [*supra*,]16 Cal.4th 930[.]" (*Shaw*, 18 Cal.5th at p. 1104 [conc. opn. of Groban, J.].) Justice Groban noted that a "divide" "in our case law makes little sense: commit two acts in quick succession against a single victim, as in *Benson*, (two strikes); commit two acts separated by mere seconds against two victims, as in *Fuhrman* (two strikes); commit a single act against a single victim that results in two convictions, as in *Vargas* (one strike); commit a single act that kills two victims, as described in today's majority opinion (one strike). The line separating each of these scenarios is blurry at best." (*Ibid.*) Justice Groban concluded that defendants who commit a violent felony after two

20

prior failed attempts at reform should be subject to the Three Strikes law, implying that he would overrule *Benson* and *Fuhrman*.

This case presents one of those "blurry" scenarios Justice Groban referred to, especially because Joseph's role in the robberies was not clearcut. Joseph's two strikes were for two robberies committed close in time against two victims.[3] That case involved the robbery of a cellphone from two victims, Rebecca Fox and her husband Salim Halabi. Fox and Halabi were in their car waiting for a friend. (*People v. Joseph*, *supra*, 33 Cal.App.5th at p. 947.) A young man approached and took Fox's cellphone after a struggle with her. Halabi chased the young man. Two other men exited a car, and one kicked Halabi. The three assailants got into the car and left. A witness saw the three passengers beating Halabi while a fourth man, the getaway driver, waited in the car. Another witness also never saw the getaway driver get out of the car. The getaway car was registered to Joseph, and surveillance video taken about an hour before the robbery showed Joseph, alone, driving his car at a fast food drive-thru and then getting out of the car and talking to several young men, who got into the car.

Based on this, defense counsel argued at the sentencing hearing that Joseph was the getaway driver who committed a single act of aiding and abetting the robbery of a cellphone. The

---

[3] The facts underlying the robberies were accurately summarized in the opinion affirming in part and reversing in part the judgment, *People v. Joseph* (2019) 33 Cal.App.5th 943. We take judicial notice of that opinion. (Evid. Code, § 452, subd. (a).) We also grant the Attorney General's request for judicial notice of the record in that appeal. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

prosecutor countered that it was unclear whether Joseph was one of the three men who attacked the second victim and, in any event, Joseph aided and abetted separate and distinct acts, snatching the cellphone from Fox and then beating Halabi to get the cellphone back.  The trial court agreed with the prosecutor and denied the *Romero* motion to strike one of robbery convictions.

Although the trial court here said it was adopting the prosecutor's argument, it is unclear what it meant by that statement.  It is unclear whether the trial court based its decision on a finding that Joseph committed separate acts, that Joseph did something more than just drive the getaway car, or that there were two victims.  Moreover, the trial court did not have the benefit of *Shaw*, and it therefore may have applied the wrong legal standard, which constitutes an abuse of discretion.  (*People v. Knoller* (2007) 41 Cal.4th 139, 156.)  We therefore remand this matter to the trial court to reconsider Joseph's *Romero* motion.  We express no opinion on what the outcome should be on remand.

## DISPOSITION

The judgment is reversed and the matter is remanded with the direction to the trial court to reconsider Joseph's motion to strike a prior conviction.  The judgment is otherwise affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:


EGERTON, J.


ADAMS, J.